2009 Ark. App. 511

**HEMPSTEAD COUNTY HUNTING CLUB, INC., Schultz Family Management Company, Po–Boy Land Company Inc., and Yellow Creek Corporation, Appellants,**

**v.**

**ARKANSAS PUBLIC SERVICE COMMISSION, Southwestern Electric Power Company, and American Electric Power Company, Appellees.**

**No. CA 08–128.**

Court of Appeals of Arkansas.

June 24, 2009.

Chisenhall, Nestrud & Julian, P.A., by Lawrence E. Chisenhall, Jr., and Munsch, Hardt, Kopf & Harr, P.C., by: Frederick W. Addison, III, Little Rock, for appellants.

Susan E. D'Auteuil and Lori L. Burrows, Little Rock, for appellee Ark. Pub. Serv. Comm'n.

Gill, Elrod, Ragon, Owen & Sherman, by Stephen K. Cuffman; Perkins & Trotter, PLLC, Little Rock, by Kelly M. McQueen, and Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A., Rogers, by David R. Matthews, Little Rock, for appellee Sw. Elec. Power Co.

KAREN R. BAKER, Judge.

Appellants Hempstead County Hunting Club, Inc. (Hempstead Hunting), Schultz Family Management Company (Schultz Family), Po–Boy Land Company, Inc. (Po–Boy Land), and Yellow Creek Corporation (Yellow Creek) challenge the Arkansas Public Service Commission's (APSC) grant of a Certificate of Environmental Compatibility and Public Need (CECPN) to Southwestern Electric Power Company (SWEPCO), pursuant to the Utility Facility Environmental and Economic Protection Act, for the construction and operation of a coal-fired generating plant in Hempstead County, Arkansas (the Turk Plant). Appellants assert two points of error:

(1) The APSC erred by failing to comply with the requirements of the CECPN statute; and (2) The APSC

erred by failing to resolve conflicts in the testimony, that its decision was arbitrary, and is not supported by substantial evidence.

The first point of error is divided into three subparts: 1) that the APSC erred by failing to resolve all matters in a single proceeding as required by Arkansas Code Annotated section 23–18–502; 2) that the APSC erred by resolving the basis of the need for the facility in a separate non-CECPN statute proceeding; and 3) that the APSC erred by failing to address alternatives in the manner required by the CECPN statute.

We agree with appellants' first point of error and reverse APSC's grant of the CECPN application to build the Turk Plant.

*Factual Background*

The events leading to this appeal began when SWEPCO, a wholly-owned subsidiary of American Electric Power Company, Inc. (AEP),[1] filed an application with the APSC to allow SWEPCO to acquire new power supply resources. Its application described its need for short-term and long-term capacity. The long-term resources consisted of three components: up to 500 megawatts (MW) of peaking in 2008; up to 500 MW of intermediate generation beginning in 2010; and up to 600 MW of baseload resources by 2011. SWEPCO sought a finding of need from the APSC. This application was filed on January 26, 2006, and the APSC established Docket No. 06–024 (the Needs Docket) to address SWEPCO's request. This docket was a separate proceeding from the docket in this appeal, No. 06–154–U, and the only parties that participated in the Needs Docket

---

1. AEP engages in the general electric utility business of generating, transmitting, distributing, and selling wholesale and retail electric power and energy to customers in Arkansas, Texas, and Louisiana.

were SWEPCO and the General Staff of the APSC (Staff).

At the conclusion of the docket, the APSC, on June 9, 2006, issued Order No. 3 in which it found that SWEPCO had demonstrated a need for additional power resources but also held that nothing in Order No. 3 represented an APSC finding regarding any specific proposals SWEPCO may have proffer to address its need for additional power resources. Soon thereafter, SWEPCO filed three separate applications pursuant to the Utility Facility Environmental and Economic Protection Act, Arkansas Code Annotated sections 23–18–501 to –530 (Repl.2002 and Supp.2007),[2] (hereinafter referred to as the Utility Act), to obtain CECPNs from the APSC to satisfy its long-term needs:

1. Docket No. 06–100–U, filed with the APSC on July 20, 2006, concerned SWEPCO's request to build a natural gas-fired peaking facility, which will generate 332 MW of summer peaking[3] capacity, in Washington County, Arkansas (the Tontitown Plant).

2. Docket No. 06–120–U, filed with the APSC on September 1, 2006, was a request to build a natural gas-fired combined-cycle intermediate[4] generating facility of 500 MW in Shreveport, Louisiana, which would be located at SWEPCO's existing Arsenal Hill Power Plant site.

3. Docket No. 06–154–U, filed December 8, 2006, is the docket involved in this appeal. Here, SWEPCO requested a CECPN[5] to build a coal-fired baseload[6] facility, designed to generate 600 MW of net generating capacity in Hempstead County, Arkansas (also referred to as the Turk Plant). This proposed baseload facility would consist of a single pulverized coal, ultra-supercritical steam generator to be fueled by bituminous coal from the southern Powder River Basin in Wyoming.

Following SWEPCO's application filed in this docket, a letter from Staff was also filed that notified certain state offices and agencies of SWEPCO's application,[7] where it was available for inspection, and invited comments as to the adequacy of SWEPCO's statements.

Only the Attorney General's Office notified the APSC that it would participate

---

2. The Utility Act was amended in 2007 after this proceeding began but none of the amended sections affect this appeal.

3. Peaking generation is operated in response to short periods of high demand that occur on weekdays during the summer.

4. Intermediate generation is deployed after baseload generation but before peaking generation.

5. A CECPN is referred to in the Utility Act as a "certificate." *See* Ark.Code Ann. § 23–18–510(a)(Supp.2007).

6. Baseload serves the 24–hour minimum level of customers' electricity demand.

7. The following agencies were listed on the mailing list:

The Attorney General's Office
Arkansas Commissioner of State Lands
Arkansas Waterways Commission
Arkansas Geological Commission
Arkansas Natural Resources Commission
Arkansas Energy Office
Arkansas Game and Fish Commission
Arkansas Forestry Commission
Arkansas Department of Environmental Quality
Department of Arkansas Heritage
Arkansas Highway & Transportation Department
Arkansas Department of Health and Human Services
Arkansas Department of Finance and Administration
Arkansas Department of Economic Development
Arkansas Department of Aeronautics
The Governor's Office

as a party to this docket. Appellants were not included in this mailing; however, between December 28 and January 4, separate appellants filed motions to intervene. SWEPCO objected to their intervention, but in Order No. 2, the APSC granted appellants' intervention request "on the condition that these entities intervene and participate in this proceeding as a single and united interest represented by common legal counsel." Thereafter, appellants participated in the application process, including filing testimony, cross-examining adverse witnesses, and filing various motions and briefs with the APSC. A total of twenty-seven witnesses filed testimony and exhibits and/or presented testimony at the evidentiary hearing before the APSC. At the conclusion of the hearing, the APSC and parties visited an existing SWEPCO coal-fired baseload generating plant in Northwest Arkansas (the Flint Creek Plant), the proposed site of the Turk Plant in Hempstead County, and appellants' private properties around the Turk Plant site. The parties then filed proposed findings of facts and conclusions of law as well as briefs in support of their positions. On November 21, 2007, the APSC entered Order No. 11.

Order No. 11 granted SWEPCO the CECPN it needed to move forward with its plan to build the Turk Plant subject to twelve conditions. Although APSC Chairman Paul Suskie joined in Order No. 11 with Commissioner Daryl Bassett, he also filed a separate Concurring Opinion in which Commissioner Bassett joined expressing grave concerns over the continued use of coal-generated electricity. Special Commissioner David Newbern filed a Dissenting Opinion. On December 11, appellants filed their application for rehearing of Order No. 11, pursuant to Arkansas Code Annotated sections 23–2–422 and 23–18–524(a) (Repl.2002). SWEPCO filed a motion requesting clarification of some of the conditions the APSC had set in Order No. 11 on December 12.

Order No. 13, filed December 31, 2007, amended several conditions of Order No. 11, as requested by SWEPCO and appellants, but otherwise denied appellants' rehearing petition with Special Commissioner Newbern dissenting. Appellants then filed their notices of appeal.[8]

### Standard of Review

Our standard of review for appeals from the APSC is limited by the provisions of Arkansas Code Annotated section 23–2–423(c) (Repl.2002); we are to determine whether the APSC's findings of fact are supported by substantial evidence, whether the APSC has regularly pursued its authority, and whether the order under review violated any right of the appellant

---

**8.** In its response to appellants' jurisdictional statement, SWEPCO argues that we must dismiss this appeal for lack of jurisdiction. It asserts that Order No. 13, which amended Order No. 11, is the final, appealable order of the APSC and the applicable statutes require appellants to appeal that order and not Order No. 11. The statute by its terms provides that any party to a proceeding before the APSC aggrieved by "an order" may obtain review of "the order" by following certain procedures. *See* Ark.Code Ann. § 23–2–423 (Repl.2002). Neither section 23–2–423(a) nor section 23–18–524(b) cited by SWEPCO contains the lim-

itation that the final order must be appealed as a prerequisite to pursue an appeal of the order by which a party was aggrieved. Nor do the cases cited by SWEPCO support that proposition. In *Fowler v. Arkansas Public Service Comm'n*, 31 Ark.App. 155, 790 S.W.2d 183 (1990), the order the appellants sought to appeal was interlocutory in nature with no final disposition of the matter. This court specifically held that once the final order was entered an appeal could be taken and the issue raised. Accordingly, SWEPCO's jurisdictional argument is without merit.

under the laws or the constitutions of the State of Arkansas or the United States. *Bryant v. Arkansas Pub. Serv. Comm'n,* 46 Ark.App. 88, 102, 877 S.W.2d 594, 602 (1994). If an order of the APSC is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, nor discriminatory, then we must affirm its action. *Id.* It is our duty to decide the questions of law involved and to direct the APSC where it has not pursued its authority in compliance with the statutes governing it or with the state and federal constitutions. *Id.* In questions pertaining to the regular pursuit of the APSC's authority, the courts have the power and duty to direct the APSC in the performance of its functions insofar as necessary to assure compliance by it with the statutes and constitutions. *Brandon v. Arkansas Western Gas Co.,* 76 Ark.App. 201, 209, 61 S.W.3d 193, 199 (2001). In fulfilling this court's duty, we recognize that the APSC is a creature of the General Assembly with its power and authority limited to that which the legislature confers upon it. *See Arkansas County v. Desha County,* 342 Ark. 135, 140, 27 S.W.3d 379, 383 (2000).

Appellants' first allegation of error asserts that the APSC's decision is unlawful because it failed to resolve all matters in a single proceeding pursuant to the statutory framework. At issue is whether the APSC had the legislative authority, utilizing the procedural process it employed, to resolve the matters necessary to grant SWEPCO a CECPN to construct, own, operate, and maintain the 600–MW Turk Plant in Hempstead County, Arkansas. The parties disagree as to whether the procedures satisfied the requirement of a single proceeding set forth in Arkansas Code Annotated section 23–18–502 (Repl. 2002), even though each party asserts that the statute is unambiguous. Specifically, the parties disagree about whether mat-

ters relating to the transmission lines at the Turk Plant must be a part of the single proceeding. Therefore, resolution of this appeal requires the examination of the construction and application of the statute.

The question of the correct interpretation and application of an Arkansas statute is a question of law, which we decide de novo. *Cooper Realty Inv., Inc. v. Arkansas Contractors Licensing Bd.,* 355 Ark. 156, 160, 134 S.W.3d 1, 3 (2003); *see also Baker Refrigeration Systems, Inc. v. Weiss,* 360 Ark. 388, 395, 201 S.W.3d 900, 903 (2005). When examining an issue of statutory construction, our cardinal rule is to give effect to the intent of the legislature. *Arkansas Gas Consumers, Inc. v. Arkansas Pub. Serv. Comm'n,* 354 Ark. 37, 49, 118 S.W.3d 109, 118 (2003). Where the language of a statute is clear and unambiguous, this court determines legislative intent from the ordinary meaning of the language used. *McMickle v. Griffin,* 369 Ark. 318, 323, 254 S.W.3d 729, 735 (2007). The statute should be construed so that no word is left void, superfluous, or insignificant; and meaning and effect must be given to every word in the statute if possible. *Kildow v. Baldwin Piano & Organ,* 333 Ark. 335, 338–39, 969 S.W.2d 190, 191–92 (1998).

Where the meaning is unclear, our review becomes an examination of the whole act. *Barclay v. First Paris Holding Co.,* 344 Ark. 711, 718, 42 S.W.3d 496, 500 (2001). We reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part. *Id.* This court looks to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. *Arkansas Gas Consumers, Inc.,* 354 Ark. at 49–50, 118 S.W.3d at 116.

Ordinarily, agency interpretations of statutes are afforded great deference, even though they are not binding. *Brookshire v. Adcock,* 2009 Ark. 207, at 5, 307 S.W.3d 22, 26. However, despite the fact that an agency's interpretation is highly persuasive, where the statute is not ambiguous, we will not interpret it to mean anything other than what it says. *Id.*; *see also Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n,* 20 Ark.App. 30, 727 S.W.2d 384 (1987). This court does not engage in statutory interpretations that defy common sense and produce absurd results. *Southwestern Bell Telephone, L.P. v. Director of Arkansas Employment Sec. Dep't,* 93 Ark.App. 303, 309, 218 S.W.3d 317, 321 (2005).

For the reasons set forth below, we find that the statutory purpose of requiring the expeditious resolution of all matters in a single proceeding, as mandated in section 23–18–502 of Arkansas Code Annotated, is unambiguous. Accordingly, we employ a de novo review.

*The APSC Erred in Failing to
Resolve All Matters in a
Single Proceeding*

Appellees contend that the APSC conducted a single proceeding for the Turk Plant separately from the transmission lines, and that the conduction of separate proceedings is in conformance with the CECPN law. In determining whether conducting one proceeding for the generating plant and another for the transmission lines is statutorily sound, we must determine what is meant by the term "single proceeding" as used in Arkansas Code Annotated section 23–18–502:

(a) The General Assembly finds and declares that there is at present and will continue to be a growing need for electric and gas public utility services which will require the construction of major new facilities. It is recognized that the facilities cannot be built without affecting in some way the physical environment where such facilities are located and without the expenditure of massive amounts of capital.

(b) The General Assembly further finds that it is essential in the public interest to minimize any adverse effect upon the environment and upon the quality of life of the people of the state which the new facilities might cause and to minimize the economic costs to the people of the state of obtaining reliable, clean, safe, and adequate energy supplies.

(c) The General Assembly further finds that present laws and practices relating to the location, financing, construction, and operation of the utility facilities should be strengthened to protect environmental values, to encourage the development of alternative renewable and nonrenewable energy technologies which are energy-efficient, and to take into account the total cost to society of such facilities. Present laws and practices may result in undue costly delays in new construction, may encourage the development of energy technologies which are relatively inefficient, and may increase costs, which will eventually be borne by the people of the state in the form of higher utility rates. These existing laws and practices threaten the ability of utilities to meet the needs of the people of the state for economical and reliable utility service.

(d) Furthermore, the General Assembly finds that there should be provided an adequate opportunity for individuals, groups interested in energy and resource conservation and the protection of the environment, state and regional agencies, local governments, and other public bodies to participate in timely fashion in decisions regarding the loca-

tion, financing, construction, and operation of major facilities.

(e) The General Assembly, therefore, declares that it shall be the purpose of this subchapter to provide a forum with exclusive and final jurisdiction, except as provided in §§ 23–18–505 and 23–18–506, for the expeditious resolution *of all matters concerning the location, financing, construction, and operation of electric generating plants and electric and gas transmission lines and associated facilities in a single proceeding* to which access will be open to individuals, groups, state and regional agencies, local governments, and other public bodies to enable them to participate in these decisions. These matters presently under the jurisdiction of multiple state, regional, and local agencies are declared to be of statewide interest.

Ark.Code Ann. § 23–18–502 (emphasis ours).

The plain language of the statute states the legislature's objective to provide an adequate opportunity for timely participation in decisions regarding the location, financing, construction, and operation of major facilities. The statute also declares its specific purpose to provide a forum with exclusive and final jurisdiction for resolution of all matters concerning the location, financing, construction, and operation of electric generating plants and electric and gas transmission lines and associated facilities in a single proceeding to which access will be open to individuals, groups, state and regional agencies, local governments, and other public bodies to enable them to participate in these decisions.

Appellee SWEPCO argues that prior to the enactment of the statute, numerous state, regional, and local agencies had a hand in permitting and reviewing the construction of major utility facilities such as a power plant. The result was a confusing and overlapping regulatory maze that frequently left the public unaware of the appropriate forum in which to raise concerns. The APSC tenders the proposition that while section 23–18–502(e) provides for consideration of all non-ADEQ issues related to a single major utility, such as a generating plant, in a single proceeding, it does not require proceedings at other agencies or other states to be considered in that same proceeding. To that specific proposition, we state that if the legislature's use of the words "single proceeding" was intended to exclude these other entities, then the words "forum with exclusive jurisdiction" become unnecessary. The APSC also submits that while it is axiomatic that statutes are afforded their plain language meaning, that "plain language" in the context of utility regulation usually has a different meaning from day-to-day usage. Applying a meaning different from the day-to-day usage of the language, the APSC concludes that conducting one proceeding for all matters concerning the generating plant and conducting another for the transmission lines is lawful.

We disagree with the premise that the statutory language used here contains terms of art unique to the utility industry for which only insiders of the industry are privy. Inherent in SWEPCO's argument is the understanding that the statutory requirement of a single proceeding was designed to resolve the confusion created by a regulatory maze and to establish and clarify public awareness of the appropriate forum. Accepting that the plain language of a statute usually means something different from the day-to-day usage understood by our citizens would controvert the purpose of the legislation. Accordingly, we will not interpret it to mean anything other than what it says. *Brookshire, supra*. The statute says that its

purpose is to provide a forum for the expeditious resolution of all matters in a single proceeding for generating plants *and* transmission lines, not one proceeding for generating plants and *another* for transmission lines. Despite appellees' contentions to the contrary, including the feasibility of the transmission lines is a necessary consideration for the operation of the generating plant.[9] With no means to transmit the power generated by the plant, the facility is useless to meet the public's need for utility services.

We find particularly unpersuasive the argument that the past practice of separating the CECPN proceedings for plants and their transmission lines supports appellees' "term of art" interpretation of the statute. Significantly, the APSC's procedure of separating |13generating plants from transmission lines in CECPN pro-

ceedings has never been challenged in a court proceeding.[10] The mere fact that the practice has gone unchallenged cannot create a presumption that it is proper.[11] The question of the correct interpretation and application of the statute is a question of law, which the appellate court decides de novo. *See Cooper, supra.* The statute reflects the legislature's response to practices that threatened the ability of utilities to meet the needs of the people of this state for economical and reliable utility service and to take into account the total economic and environmental costs to the people of this state.

Nor do we find compelling the contention proposed by SWEPCO and the APSC that the definition of "major utility facility" set forth in Arkansas Code Annotated section |1423-18-503(5) governs our interpretation of Arkansas Code Annotated section

9. SWEPCO and the APSC argue that interpreting the Utility Act to require a major utility facility and transmission lines be considered in a single proceeding results in the absurdity of precluding approval of additional transmission lines for existing major utility facilities. We disagree, finding as did the dissenting commissioner, "[u]ndoubtedly, it would be appropriate for the Commission to entertain an application for a certificate approving a transmission facility in isolation if, for example, it were to be built to serve a preexisting generating facility. It defies common sense, however, to say in a case such as this that a separate "docket" is required to consider transmission lines which are to be integrally associated with the proposed plant...." Newbern, dissenting at pg. 17.

10. Furthermore, references to authority asserted by the Southwest Power Pool (SPP), this area's Regional Transmission Organization which governs transmission by SWEPCO and other electric utilities in Arkansas, is inapplicable to our analysis. Order No. 11 gives a detailed discussion about the SPP and explains that the SPP will not support SWEPCO's application for transmission service until it conducts a study, posts results, and SWEPCO agrees to remedy any reliability de-

ficiencies found in the study. Order No. 11 notes the difficulties SWEPCO has stated it had in determining what specific facilities will be required for the SPP process and that it did not feel it was prudent to include potential transmission facilities in its application for a CECPN for the Turk Plant. However, the SPP's authority over transmission lines is recent, receiving its certificate of public convenience and necessity to transact the business of a public utility by asserting functional control of certain transmission facilities in Arkansas in an order filed in 2006. Its authority was not a consideration when the Utility Act was passed in 1973 and does not alter its meaning.

11. We note the procedure followed in the Flint Creek Coal Power Plant. There, separate applications were filed and separate dockets were created for the generating plant and transmission lines; however, both applications were filed on the same day, the two dockets were combined for purposes of the public hearing, and a single order, Order No. 10, was issued for both dockets granting a CECPN. Although filed in separate dockets, that particular case cited by appellees was consolidated into one proceeding for a hearing before the APSC.

23–18–502(e). They argue that a generating plant is a separate major utility facility from transmission lines and the single proceeding language of subsection 502(e) refers to a single "major utility facility."

Section 23–18–503 (Supp.2007) defines the terms used in the Utility Act and provides that, unless the context otherwise requires:

(5) "Major utility facility" means:

(A) Electric generating plant and associated transportation and storage facilities for fuel and other facilities designed for, or capable of, operation at a capacity of fifty megawatts (50 MW) or more;

(B) For the sole purpose of requiring an environmental impact statement hereunder, an electric transmission line and associated facilities, including substations, of a design voltage one hundred kilovolts (100 kV) or more, extending a distance of more than ten (10) miles, or of a design voltage of one hundred seventy kilovolts (170 kV) or more, extending a distance of more than one (1) mile; and

(C) For the sole purpose of requiring an environmental impact statement hereunder, a gas transmission line....

The term "major utility facility" is not used in section 23–18–502(e). Section 502(e) refers specifically to "generating plants" and "electric and gas transmission lines" as being resolved in a single proceeding. In considering the meaning of a statute, it should be construed so that no word is left void, superfluous, or insignificant, and give meaning and effect to every word in the statute if possible. *See Arkansas Dep't of Econ. Dev. v. William J. Clinton Presidential Found.*, 364 Ark. 40, 48, 216 S.W.3d 119, 124–25 (2005). The legislature's specific use of the terms "generating plants" and "transmission lines" makes the definition of "major utility facility" irrelevant for construing section 23–18–502(e) because the legislature used more precise terminology.

Our legislature structured a single-proceeding process to ensure timely community participation and thorough discussion of the economic and environmental issues that will undeniably impact the facility's ability to meet the citizens' utility needs. The prefiled testimony of intervenor Emon Mahony, filed February 6, 2007, illustrates the necessity for a single proceeding in order to fulfill the legislative purpose:

[G]iven the General Assembly's emphasis on protecting the environment, it would be prudent to combine in one proceeding all of the necessary accouterments of the siting of the plant which might affect the environment. In this particular case, these would include, among other things, the impact on the specific environment near the railroad tracks of hauling coal, and the attendant leakage of coal into the environment near the tracks. It also would include the impact of the location of the transmission lines on the environment in the vicinity of the transmission lines. To do otherwise would preclude meaningful consideration of all of the impacts of the project as a whole, both direct and indirect, as required by statute, which conceivably might preclude construction of the plant. Alternatively, once the plant is sited, then defenses will be made that "The plant is already approved for this site, and the lines have to come out in a certain manner."...

... In addition, if the plant site is approved and construction begins, and later it is determined that another portion of the project such as coal trains or transmission lines have adverse environmental effects of a magnitude to preclude using the plant site, then we will

have occasioned unacceptable waste. Thus, piecemeal consideration will not meet the expressed purpose of the General Assembly.

Piecemeal consideration of all the matters concerning a generating plant and its transmission lines corrupts the spirit and letter of the law. In this case, the APSC considered the issues of the need for baseload capacity in one docket, the construction and ₁₆financing of the generating plant in a second docket, and the proposed transmission line construction and location into yet another anticipated third docket. Separating the issues into three distinct proceedings subverted the clear intent of the legislature for the APSC to structure a comprehensive evaluation of proposals in order to determine the economical and environmentally safe provision of utility services to the public.

The APSC is statutorily required to structure a comprehensive evaluation based upon service needs and the most economical and environmentally safe means to meet the needs of the people served. The participation of the people served is essential to that process. The determination of how the power will be transmitted to its users is a critical factor in determining whether the proposed facility can meet the utility needs of the people it serves.

In its brief, the APSC concludes, "When all is said and done, the APSC and SWEPCO have a responsibility to ensure that safe and reliable electricity is available to SWEPCO's customers today and in the future." Our legislature has determined that the responsibility to ensure safe and reliable electricity requires the APSC to resolve all matters concerning the location, financing, construction, and operation of electric generating plants and electric and gas transmission lines and associated facilities in a single proceeding to which access will be open to individuals, groups, state and regional agencies, local governments, and other public bodies to enable them to participate in these decisions. The APSC failed to resolve all matters in a single proceeding. Accordingly, we reverse the grant of the CECPN application to build the Turk Plant and, if SWEPCO chooses to reapply for a CECPN, direct the APSC to conduct a single proceeding in compliance with Arkansas ₁₇Code Annotated section 23–18–502.

*The APSC Erred in Failing to Find the Basis of the Need in the CECPN Proceeding*

■ Appellants also contend that the APSC erred in failing to make a finding regarding the basis of the need for the Turk Plant in this proceeding as required by the Utility Act.[12] Instead, the APSC stated that it had previously found a need by SWEPCO for additional power supply resources in the Needs Docket in Order No. 3 and did not need to make a finding of the basis of the need in this proceeding. We disagree that Order No. 3 satisfied the APSC's duty to make a finding of the basis of the need for the Turk Plant.[13]

12. Appellees argue that appellants waived this specific challenge because appellants did not appeal from the Needs Docket and because the Issues List for this docket, signed by a staff attorney for APSC, included a statement that SWEPCO's need for baseload generation is not contested. However, appellants were neither parties to the Needs Docket nor notified of its existence. Further, as we hold herein, the finding of SWEPCO's need for baseload generation in the Needs Docket does not satisfy the APSC's obligation to make the findings required by the Utility Act.

13. SWEPCO and the Staff of the APSC argue that the separate Needs Docket was required to be filed pursuant to the Regulatory Reform Act of 2003, codified in part at Arkansas Code Annotated section 23–18–106 (Supp.2007).

Arkansas Code Annotated section 23–18–511(3) (Supp.2007) requires an applicant for a CECPN to include in its application "[a] statement of the need and reasons for construction of the facility." Further, and of critical importance in this proceeding, the very first finding required of the APSC before it may grant a CECPN is "[t]he basis of the need for the facility." Ark.Code Ann. § 23–18–519(b)(1) (Supp. 2007).

While we express no opinion regarding the purpose or requirements in a resource planning docket, as the appellees refer to the Needs Docket, we do hold that the Utility Act requires the APSC to "find and determine … the basis of the need" for the Turk Plant in this docket. *See* Ark. Code Ann. § 23–18–519(b)(1). While Order No. 3—finding that SWEPCO demonstrated a need for additional power resources, including baseload capacity—may be some evidence of SWEPCO's need for the Turk Plant, Order No. 3 does not satisfy the Commission's duty to determine the basis of the need for the Turk Plant under the Utility Act.[14]

### The APSC Erred in Failing to Require SWEPCO to Address Alternative Locations

█ Because SWEPCO may choose to file another application for a CECPN to build the Turk Plant, we briefly address the failure of SWEPCO's application to adequately address alternative locations. Arkansas Code Annotated section 23–18–511 requires an applicant for a CECPN to include in its verified application the following information (among other things): a general description of the location and type of major utility facility proposed to be built; a general description of any reasonable alternate locations considered for the proposed facility; and an environmental impact statement (EIS)

(A) … which shall fully develop the four (4) factors listed in subdivision (8)(B) of this section, treating in reasonable detail such considerations, if applicable, as the proposed facility's direct and indirect effect on the ecology of the land, air and water environment, established park and recreational areas, and on any sites of natural, historic, and scenic values and resources of the area in which the facility is to be located, and any other relevant environmental effects.

(B) The environmental impact statement [EIS] shall set out:

(i) The environmental impact of the proposed action;

(ii) Any adverse environmental effects which cannot be avoided;

(iii) A description of the comparative merits and detriments of each alternate location or for generating plants, the energy production process considered, and a statement of the reasons why the proposed location and production process were selected for the facility; and

(iv) Any irreversible and irretrievable commitments of resources that would

---

This Act solely addresses the planning process for electric-utility resources, not the application for a specific facility, which is governed by the Utility Act.

14. A system-wide need for additional power resources is essential to a finding of need for a specific facility. The APSC is required by the Utility Act to determine the existence of this need in the CECPN proceeding. Additionally, once established, other ways to meet the need must be considered which include, but are not limited to, purchased-power agreements or the retooling of old facilities rather than building a new facility. This Utility Act requirement is not satisfied by the APSC's findings made in the applicant's separate resource planning docket.

be involved in the proposed action should it be implemented;

. . . .

Ark.Code Ann. § 23–18–511(8). With regard to this information, before the APSC may grant a CECPN, Arkansas Code Annotated section 23–18–519(b)(4) requires the APSC to find and determine that "the facility represents an acceptable adverse environmental impact, considering the state of available technology, the requirements of the customers of the applicant for utility service, the nature and economics of the proposal, and the various alternatives, if any, and other pertinent considerations."

SWEPCO's application and attached EIS refer only to a study commissioned by SWEPCO's parent company, AEP. The study, conducted by Sargent & Lundy, an engineering consulting firm, evaluated a total of nine sites as potential baseload facility sites: four were in Arkansas, four were in Louisiana, and one was in Texas. SWEPCO's application states that the Hempstead site was selected because it was large enough to accommodate the facility, had an adequate water supply, had nearby rail access, and had a property owner willing to sell. The other sites were not mentioned.

Staff witness Clark Cotten admitted that SWEPCO's EIS did not contain a description of the comparative merits and detriments of each alternative location as required by section 23–18–511(8)(B)(iii). Indeed, SWEPCO's brief admits as much.

This is particularly disturbing because the Sargent & Lundy study did not find the Hempstead location to be the most suitable of the sites considered. In fact, SWEPCO witness James Kobyra testified that the Hempstead site ranked number seven out of ten sites in the initial study and did not come up as a preferred or alternative site in the State of Arkansas. The Sargent & Lundy study was the only

site-selection study cited by SWEPCO and it provides little, if any, support for the selection of the Hempstead site. We hold SWEPCO's application, including the EIS, did not provide sufficient information regarding alternative locations or the comparative merits and detriments of each alternate location to satisfy sections 23–18–511(2) and (8)(b)(iii).

*Conclusion*

For the foregoing reasons, we reverse the grant of the CECPN application to build the Turk Plant and, if SWEPCO chooses to reapply for a CECPN, direct the APSC to conduct a single proceeding in compliance with the Utility Act, to make the statutory findings required, to resolve all matters regarding the generating plant and transmission lines and basis of need for such a facility in a single proceeding, and provide the appropriate notices with adequate opportunity for interested parties to participate in the decision.

Reversed.

HART, GLADWIN, GRUBER, GLOVER, and BROWN, JJ., agree.

HART, J., concurs.

JOSEPHINE LINKER HART, Judge, concurring.

Though I agree with the court and join its opinion, I write separately to address the APSC's conclusion that SWEPCO's need for additional power resources had been decided in an earlier docket and that the only issue before the APSC was SWEPCO's application for a CECPN to build and operate the Turk Plant. The question of whether SWEPCO may need to acquire additional power resources cannot be separated from the question of whether it may build a coal-fired generating facility. Rather, relevant statutes pro-

vide that the need for additional power supply resources and the building of a plant must be considered in the same docket. Further, issues related to transmission lines likewise cannot be separated from these determinations. As the record demonstrates, failure to consider these matters in the same proceeding resulted in inefficiencies. Agencies that were designed to protect the interests of the public were conspicuously absent from the proceedings, and relevant proceedings were farmed out to other governing authorities. Further, interested parties were not notified of relevant proceedings, and as a result, the APSC not only failed to consider alternatives to building the Turk Plant, but also failed to consider issues that may arise regarding transmission lines.

On January 26, 2006, SWEPCO filed with the APSC a needs application, and APSC Docket No. 06–024–U was created to address the application. This application was heard by the APSC, without notice being given except on the APSC's website. The APSC, in Order No. 3, ruled that SWEPCO had demonstrated a need for additional power supply resources and granted the needs application. The order also found that "nothing in this order represents a Commission's finding (1) regarding any specific proposal(s) SWEPCO may proffer to address its need for additional power supply resources." In December of 2006, SWEPCO filed its application for a CECPN to build the Turk Plant, which was ultimately granted. The APSC, in Order No. 11 of the CECPN docket, stated: "SWEPCO'S Declaration of Need Application in Docket No. 06–024–U was not appealed, and therefore, represents the Commission's final ruling on the matter at issue therein. Accordingly, this Commission will not revisit in the instant proceeding its final ruling in Docket No. 06–024–U."

Appellants argue on appeal that the APSC erred in approving this bifurcated process in which SWEPCO proved its need for additional power supply resources in a proceeding separate from the CECPN proceeding. During oral arguments, appellees insisted that, in the needs proceeding, the APSC only found that SWEPCO had a need for additional power supply resources and not the need for a major utility facility. SWEPCO acknowledged that a finding of need was required for additional power supply resources as a predicate to obtaining a CECPN to build and operate the Turk Plant. They treat the separation of these proceedings as a benign and expeditious way of conducting a CECPN proceeding.

The legislative intent of the Utility Act, however, requires the APSC to balance the growing need for electric and gas utility services, which may require construction of new major utility facilities, against the protection of the environment, the quality of life of the people of this state, and the development of alternative renewable and nonrenewable energy technologies. Ark. Code Ann. § 23–18–502 (Repl.2002). To facilitate the balancing of these factors, an application for a CECPN must contain "[a] statement of the need and reasons for the construction of the facility." Ark.Code Ann. § 23–18–511(3) (Supp.2007). The APSC may not grant a CECPN unless it determines the "basis of the need for the facility." See Ark.Code Ann. § 23–18–519(b)(1) (Supp.2007). Thus, the "need" determination is essential to the CECPN process. Accordingly, the "single proceeding" mandate of the Utility Act required that the APSC determine the basis of SWEPCO's need as part of the CECPN proceeding. Ark.Code Ann. § 23–18–502(e).

SWEPCO sought this determination in a separate docket, even though, in every pri-

or CECPN proceeding for a new baseload power plant, need had been determined as part of the CECPN proceeding. The net effect of the separate proceeding prevented the parties to the CECPN proceeding from being able to challenge need and allowed SWEPCO to seek a CECPN for a generating plant without again addressing the need for additional power resources. The APSC staff apparently acquiesced in this separate proceeding, and SWEPCO was allowed to pursue its application for need in a proceeding separate from its CECPN application. In doing so, appellees were able to proceed without giving the statutory notice required by the Utility Act. *See* Ark.Code Ann. § 23–18–513 (Supp.2007).

As noted by Special Commissioner David Newbern in his dissent, there was evidence that SWEPCO could satisfy its retail customers' needs for power without expanding its generating capacity:

Venita McCellon–Allen, Chief Operating Officer of SWEPCO testified that approximately 21 per cent of SWEPCO's overall power generation is sold to wholesale purchasers who then resell the power to their customers.... While some of the contractual arrangements are very complicated, it is clear that these contracts are purely voluntary on the part of SWEPCO and that the return on its equity earned by SWEPCO from those contracts is not shared with the ratepayers, i.e., retail customers....

It becomes apparent that SWEPCO could satisfy its retail customers' need for power. without expansion of its generating capacity by declining to renew some of its expiring wholesale contracts for a period of time during which the costs of regulation, or the developing technology for the capture and seques-

tration of, coal plant emissions could be better ascertained....

Obviously, the issue of the need for increased capacity in light of these facts should have been a part of this [CECPN] proceeding in addition to that of the transmission lines. If the need for power to be sold through the retail rates subject to this Commission's jurisdiction could be satisfied by the nonrenewal of one or more of the wholesale contracts, we would not be faced with the issue of the environmental damage in prospect upon approval of the application before us.

(Footnotes omitted.)

But more importantly, Newbern also questioned whether the increased need of SWEPCO could be supplied by another generating plant already in place. In his dissent, Newbern observed that one of the tragedies that came to light in the CECPN proceeding was that there is a large, highly efficient combined gas-fired plant known as the Union Power Station at El Dorado, Arkansas, owned by the Entegra Power Group, LLC (Entegra), which could produce far more power than SWEPCO needed. The 2200 MW Union Power Station, which is just over 100 miles by road from the Turk Plant site, is within SWEPCO's Control Area, but is mostly idle because of its inability to transmit its product out of the Entergy Control Area in which it is sited. Entegra's resources were known to SWEPCO, but they were not mentioned in SWEPCO's needs application, and their availability came to light when Entegra petitioned to intervene in the CECPN docket. In Order No. 4 entered January 26, 2007, the APSC denied intervention. The APSC based its decision, at least in part, on the determination that Entegra had not shown good cause to support its petition to intervene. The APSC's denial removed from consideration the possibility

that Entegra could supply power in excess of the 600 MW that SWEPCO claimed it needed to meet customer demands and eliminate SWEPCO's need to build an additional generating facility. Entegra did not appeal the denial of its intervention petition, although it could have done so after petitioning for rehearing. *See* Ark. Code Ann. § 23–18–524 (Repl.2002). Nor did it join appellants in this appeal.

Thus, the APSC failed to consider this alternative source as a potential supplier of power to meet SWEPCO's increased need even though the APSC was aware of the excess capacity of Entegra's Union Power Station. While not before us, I nevertheless discuss these matters to emphasize that there were alternatives that should have been considered by the APSC before granting an application to build an additional generating plant in Hempstead County at an initial estimated capital cost of $1.343 billion, and that should be considered as part of a single proceeding should SWEPCO decide to reapply for a CECPN. The cost of the facility will ultimately be borne by the retail customers (rate payers) because the profit or return on equity made from SWEPCO's contract sales (wholesale markets) is not shared with the rate payers. It defies understanding that the APSC could not find good cause to allow Entegra to intervene in the Turk Plant proceeding to determine the viability of SWEPCO purchasing power from Entegra and thereby eliminating SWEPCO's need to build a coal-fired generating fa-

cility in Hempstead County, especially in view of the assertion that the purchase of such power would be at a lower cost than the power generated by SWEPCO's proposed plant.

Under the Utility Act, the APSC must consider other options to fill SWEPCO's resource needs. *See* Ark.Code Ann. § 23–18–519(b)(4). Consequently, the extraordinary and unprecedented request of obtaining a determination of need prior to filing the CECPN application, without giving notice, prevented other baseload alternatives from coming to light, ultimately eliminate any competition that stood in the coal-fired facility's way. Without appreciating that a finding of need is a critical part of the proof SWEPCO must present to obtain a CECPN, the APSC denied appellants an opportunity to challenge SWEPCO's proof by binding them to a decision made in a docket to which they were not parties and were not given notice. The "public notice" that appellees contend was given—all APSC filings are available in real time on its website—is largely illusory. Posting filings on the APSC website does not come close to meeting the requirements of Ark. Code Ann. § 23–18–513.[1] This procedure denied appellants that statutory right under the Utility Act, which mandates an "adequate opportunity for individuals, groups interested in energy and resource conservation and the protection of the environment, state and regional agencies, local governments, and other public bodies

---

1. Arkansas Code Ann. section 23–18–513 is a very detail statute that requires, among other things, proof of service of the CECPN application on certain county and municipal officials and members of the General Assembly, the director or administrative head of specified Arkansas agencies, the offices of the Governor and the Attorney General, the head of any governmental agency charged with the duty of protecting the environment or of planning land use, and each owner of real property on

the proposed route selected by the utility on which a major utility facility is to be located or constructed. It also requires that the CECPN application be made available for public inspection in the public libraries in each county where the facility is to be located. Public notice must also be given by publication in a newspaper having substantial circulation in the municipalities and counties where the facility is to be located.

to participate in timely fashion in decisions regarding the location, financing, construction, and operation of major facilities." Ark.Code Ann. § 23–18–502(d). The significance of Entegra's petition to intervene demonstrates that the APSC was aware that evidence was available that could controvert SWEPCO's need for additional resources, but this evidence was not allowed and, therefore, was not considered by the APSC before it made its finding on SWEPCO's needs application. Certainly, it could not be developed by appellants, because they were not notified of the needs proceeding and, therefore, were not parties to it. Although the APSC could have remedied this omission by considering this evidence and SWEPCO's need for additional power resources in the CECPN proceeding, it refused to do so.

Furthermore, I note that evidence of alternative sources was not developed in this CECPN proceeding by the APSC staff, the only other party to the earlier needs proceeding besides SWEPCO. Instead of using the resources the Legislature gave it,[2] the APSC staff submitted the testimony of only three witnesses in the CECPN proceeding to question SWEPCO's assertion that the Turk Plant met the requirements of Ark.Code Ann. § 23–18–519. This was an inadequate response. SWEPCO, by effective representation, was able to obtain a CECPN to construct and operate the Turk Plant even though SWEPCO was not complying with the requirements for obtaining a CECPN and in the face of significant environmental concerns. If not for appel-

lants' intervention and participation in SWEPCO's CECPN proceeding, SWEPCO would have obtained its CECPN without challenge.

Also, the Office of the Attorney General acquiesced to the CECPN proceeding, thus abdicating its responsibility to protect the interests of the people of this state. The Consumer Utilities Rate Advocacy Division within the Office of the Attorney General, more commonly referred to as CURAD, was created by the General Assembly in 1981 to provide the people of Arkansas with "aggressive and effective representation in utility rate hearings and other utility-related proceedings." *See* Ark.Code Ann. § 23–4–302(a)(3) (Repl. 2002). The General Assembly gave CURAD the powers and duties (1) to provide aggressive and effective representation for the people of Arkansas in hearings before the APSC and other state and federal courts or agencies concerning utility-related matters; (2) to disseminate information to all classes of rate payers concerning pertinent energy-related concepts; and (3) to advocate the holding of utility rates to the lowest reasonable level. *See* Ark.Code Ann. § 23–4–305 (Repl.2002). Although it does not appear that the Office of the Attorney General was given notice of SWEPCO's needs application, CURAD's participation as a party in the CECPN proceeding was almost non-existent. CURAD apparently raised no objection in the CECPN proceeding to the APSC's prior finding of need. In addition, CURAD neither raised the issue of the APSC denying Entegra's petition to intervene nor ad-

2. The APSC has the power to employ "such officers, examiners, experts, engineers, statisticians, accountants, attorneys, inspectors, clerks and employees as it may deem necessary to carry out its proper function or to perform the duties and exercise the powers conferred by law" upon it. Ark.Code Ann. § 23–2–105 (Repl.2002). Moreover, the

APSC staff may, through its own experts or employees, or otherwise, secure and introduce such evidence, as it may consider necessary or desirable in any proceeding in addition to the evidence presented by the parties. Rule 3.12 of the Arkansas Public Service Commission Rules of Practice and Procedure.

dressed the alternative power source available from the Union Power Facility at El Dorado. The burden fell exclusively to appellants, private citizens, to bring the issue of separate proceedings, the need for and availability of additional resources, and the environmental impact to the attention of the APSC. The inefficiencies apparent in this proceeding prove the wisdom of the Legislature in the passage of the Utility Act, and it is to be commended for its foresight. It also magnifies the failure of the mandated agencies to act in accordance with the Act. Sixteen state agencies were notified and invited to participate in SWEPCO's CECPN proceeding. The failure of these agencies, excepting the Office of the Attorney General, to intervene and abide by the letter and spirit of their mandate after receiving notice as required by Ark.Code Ann. § 23–18–513 is disappointing.

Further, I take no comfort in the APSC deferring some of these issues to other agencies for resolution. The Utility Act requires that, before the APSC can issue a CECPN, it must identify the nature of the probable environmental impact of the facility and find that the facility represents an acceptable adverse environmental impact. See Ark.Code Ann. § 23–18–519. By deferring the potential impact of the Turk Plant to other agencies, the APSC failed to determine whether the impact was acceptable and consider the total cost of the impact. The APSC does not deny that it deferred findings on certain environmental impact to other agencies. In fact, APSC staff witness Clark Cotten testified that, to a large extent, it is his position and the staff's position that the APSC doesn't deal with environmental issues—that's somebody else's job—the Arkansas Department of Environmental Quality (ADEQ). Furthermore, after deferring issues to the ADEQ, the APSC in Order No. 11 acknowledged that it was granting SWEPCO

a CECPN to build the Turk Plant before the ADEQ had issued its final determination concerning whether the Turk Plant will meet all environmental rules and regulations. As noted in Newbern's dissent:

> While the Staff correctly suggests that ADEQ has exclusive jurisdiction of its own permitting authority, there is no conflict between that and the requirement found in Ark.Code Ann. § 23–18–519(b)(4) that the Commission not grant a certificate unless it determines "[t]hat the facility represents an acceptable adverse environmental impact...." The Commission is thus concerned with the broader issue of environmental compatibility of the proposed fuel source and the emissions it will cause. It is also concerned with the likelihood of carbon control mandates from Congress as an element of the potential cost to SWEPCO customers and the total cost to society of the proposed facility. The draft ADEQ permit is just that, and it is of no consequence to the ultimate issue in this proceeding. It is polite and appropriate to condition the issuance of the certificate upon SWEPCO meeting ADEQ's emission requirements. However, it is improper, unnecessary, short-sighted, and it leaves the public interest unprotected, for the Commission to abdicate, to any degree, its responsibility to assess the acceptability of the environmental impact of the plant on the ground that the plant may meet current ADEQ requirements.

There is nothing in the Utility Act that authorizes the APSC to ignore environmental impact. By deferring impact to ongoing reviews by other agencies, the APSC cannot determine whether the impact is acceptable and consider the total cost to the environment, nor can the APSC weigh the impact against the need of

SWEPCO for additional resources as required by Ark.Code Ann. § 23–18–519.

Moreover, consideration of electric transmission lines must be a part of the single proceeding. Ark.Code Ann. § 23–18–502(e). The impact of the electric transmission lines on the quality of life of the people of this state and the environment must be considered. *See* Ark.Code Ann. § 23–18–502. Electric transmission lines no doubt affect the people and environment as much as the building of the facility, and decisions relating to the transmission lines must be considered by the APSC under the guides established by the Legislature.

Instead, the APSC deferred to the Southwest Power Pool (SPP) as justification for its separation of the CECPN proceeding for the generating plant from the transmission lines. The SPP is the area's Regional Transmission Organization, and it governs transmission of electric utilities in Arkansas. According to APSC Order No. 11, the SPP will not support SWEPCO's application for transmission service until it conducts a study, posts results, and SWEPCO agrees to remedy any deficiencies found in the study. The APSC determined that the final decision concerning the transmission facilities and upgrades required to deliver power and energy from the Turk Plant will be performed by the SPP. Citing difficulties that SWEPCO has had determining what specific facilities will be required for the SPP study process, it stated that SWEPCO did not feel it was prudent to include potential transmission facilities in its application for the CECPN for the Turk Plant. The APSC supported separating the dockets based upon the lack of any plan to transport the power generated and by concluding that it would consider the transmission lines at a later

docket. It further justified separating the CECPN proceedings from the transmission lines by citing past practices and by noting that the SPP must grant SWEPCO authority before SWEPCO is able to provide transmission from the Turk Plant.

The Commission, however, should not grant the CECPN before the SPP approves transmission lines. The duties imposed and the authority granted by the Legislature cannot be delegated to third parties outside of the oversight of our Legislature. Moreover, the questions concerning transmission lines must be addressed, in the same single proceeding, before authority to construct a facility is finally granted by the Commission.[3] The provisional approval from the SPP of the applicant's plan for transmission should be part of the application for the CECPN. As Newbern further explained in his dissent:

> The most and the least intrusive locations for the corridors can be shown and decisions made, just as is being done here through conditioning of the approval of this application upon prohibiting the location of transmission lines locations in one instance. This case is thus left open with respect to the difficult issues of transmission line locations. A subsequent proceeding will thus deal with those issues at a depth which might well have had a bearing upon whether the certificate sought here should be granted. If, for example, there were simply no way to site transmission lines from the proposed plant without unduly intruding upon important natural areas or private properties, that undoubtedly would be a basis for denying the certificate. Surely, the need to reopen in a subsequent proceeding the evidence pro-

---

**3.** The Legislature has given the APSC the authority to open appropriate corridors for transmitting power. Ark.Code Ann. § 23–18–502(e). That authority cannot be delegated.

duced in this proceeding about the areas to be protected from power line construction and presence should be obviated if possible. If a later SPP ruling requires additional action, it should be brought before the Commission as part of this "docket," without having to recreate any part of the record.

The inefficiencies discussed herein can only be remedied by placing these matters before the APSC in a single proceeding. Accordingly, for these reasons, I concur.