# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-3452

_____

Sierra Club; National Audubon Society; *
Audubon Arkansas; Charles Mills, *
*
   Plaintiffs - Appellees, *
*
Granville Parnell, *
*
    Plaintiff, *
*
Yancey Reynolds, *
           *  Appeals from the United States
   Plaintiff - Appellee, *  District Court for the Western
           *  District of Arkansas.
    v. *
*
United States Army Corps of Engineers; *
Colonel Jeffrey R. Eckstein, In his *
Official Capacity as Current District *
Engineer, Vicksburg District, U.S. *
Army Corps of Engineers, *
*
    Defendants, *
*
Southwestern Electric Power Company, *
*
  Intervenor defendant - Appellant. *

_____

No. 10-3456

_____

Hempstead County Hunting Club, Inc.,　*
　　　　　　　　　　　　　　　　　　　*
　　　　Plaintiff - Appellee,　　　　*
　　　　　　　　　　　　　　　　　　　*
　　v.　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　*
Southwestern Electric Power Company,　*
　　　　　　　　　　　　　　　　　　　*
　　　　Defendant - Appellant,　　　*
　　　　　　　　　　　　　　　　　　　*
United States Army Corps of Engineers;　*
Colonel Jeffrey R. Eckstein, District　*
Engineer, Vicksburg District, U.S.　*
Army Corps of Engineers; United States　*
Department of the Interior; Ken Salazar,　*
Secretary of the United States　　　*
Department of the Interior; United　*
States Fish and Wildlife Service;　*
Rowan Gould, Acting Director of the　*
United States Fish and Wildlife Service,　*
　　　　　　　　　　　　　　　　　　　*
　　　　Defendants.　　　　　　　*

_____

Submitted: March 15, 2011
Filed: July 14, 2011

_____

Before WOLLMAN, MURPHY and SHEPHERD, Circuit Judges.

_____

MURPHY, Circuit Judge.

-2-

The Sierra Club and several related parties brought this action against the U.S. Army Corps of Engineers (the Corps) in February 2010, seeking to set aside a Clean Water Act permit (the § 404 permit) the Corps had issued to the Southwestern Electric Power Company (SWEPCO) which planned to construct a new power plant. After SWEPCO intervened as a defendant, the Sierra Club moved to enjoin construction of the plant. The Hempstead County Hunting Club (Hunting Club) filed a similar action against SWEPCO, the Corps, and the U.S. Fish and Wildlife Service (FWS) in July 2010. The plaintiffs alleged that SWEPCO, the Corps, and the FWS failed to comply with the National Environmental Policy Act (NEPA), the Clean Water Act (CWA), the Endangered Species Act (ESA), and Arkansas state law.

The district court[1] granted only part of the injunctive relief requested in the plaintiffs' motions for a preliminary injunction. It first held that the Sierra Club and the Hunting Club had standing to challenge the activities authorized under the § 404 permit and then that they had satisfied the criteria for a preliminary injunction, including showing a likely threat of irreparable harm and a likelihood of success on the merits. It ordered all "work authorized by the § 404 permit" to "halt immediately."

Now before the court are SWEPCO's appeals of the preliminary injunctions ordered in each case. SWEPCO argues that the district court lacked subject matter jurisdiction because the plaintiffs had failed to show an injury in fact on their NEPA, CWA, and ESA claims. It also contends that the district court abused its discretion in granting the preliminary injunction. After undertaking a thorough review of the record and the applicable law, we affirm the district court's limited injunction. See Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 689–90 (8th Cir. 2003) (standard of review).

---

[1] The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas, sitting by designation.

-3-

I.

SWEPCO conducted a resource planning process in 2005 which concluded that additional energy would be needed in Arkansas, Louisiana, and Texas. It solicited and received approvals from regulatory commissions in each of the states to construct the John W. Turk, Jr. power plant, a 600 megawatt "ultrasupercritical" pulverized coal fired facility. SWEPCO selected a 3,000 acre site in Hempstead County, Arkansas for the project. The site is near commercial pine plantations, agricultural row crop areas, cattle raising operations, railways, and other private lands, and is less than one mile from property owned by the Hunting Club, just across Arkansas Highway 355.

The Hunting Club is a nonprofit corporation whose purposes include protecting and preserving wildlife, habitat, and natural resources in Hempstead County, while the Sierra Club's purpose is to "preserve, protect, and enhance the natural environment." See, e.g., Sierra Club v. Franklin Cnty. Power of Ill., LLC, 546 F.3d 918, 924 (7th Cir. 2008), cert. denied, 129 S. Ct. 2866 (2009). The Hunting Club owns about 4,300 acres of land, including a 2,315 acre marshy body of water known as Grassy Lake. Grassy Lake forms the floor of an ancient bald cypress forest and is located in an undisturbed area north of the Little River known as the "Little River Bottoms." Grassy Lake and the Little River Bottoms are home to wildlife including alligators and over 100 species of birds. Members of the Hunting Club and the Sierra Club regularly engage in a wide variety of activities in this area. This includes duck, deer, and turkey hunting, bird watching, alligator spotting, fishing, and other activities involving local and migratory wildlife. See Hempstead Cnty. Hunting Club v. Sw. Elec. Power Co., 558 F.3d 763, 765 (8th Cir. 2009).

As part of the construction process, SWEPCO asked the Corps to issue it a permit under § 404 of the Clean Water Act. SWEPCO sought permission to discharge "dredged" or "fill" material into wetlands and stream channels so it could construct ancillary components of the power plant, including roads, a rail line, a coal

-4-

yard, a cooling water intake structure, water lines, and transmission lines. See 33 U.S.C. § 1344(a). SWEPCO began construction of the plant before the Corps had approved a § 404 permit. Although it had obtained some other state and federal permits, in April 2008 the Corps notified SWEPCO by letter that any work on the project site "prior to issuance of a Section 404 permit would be at your own risk."

Approximately one year later, on March 6, 2009, the Corps issued SWEPCO a § 404 permit. Three days later SWEPCO notified the Corps that it had already filled 2.47 acres of wetlands as a result of "errors in mapping and flagging of wetland boundaries." The Corps then withdrew its permit and required SWEPCO to conduct a new survey of wetlands subject to its jurisdiction. SWEPCO submitted a new permit application in July 2009 seeking "after-the-fact" authorization for its prior unauthorized discharge, as well as for proposed future discharges.

Then in June 2009, the Arkansas Court of Appeals invalidated SWEPCO's state Certificate of Environmental Compatibility and Public Need (Certificate) for the plant. SWEPCO's § 404 permit application had been based on the now withdrawn Certificate. See Hempstead Cnty. Hunting Club, Inc. v. Ark. Pub. Serv. Comm'n, 324 S.W.3d 697, 709 (Ark. Ct. App. 2009), aff'd as modified, 2010 Ark. 221 (2010). The Court of Appeals concluded that the Arkansas Public Service Commission (APSC) had not "f[ound] and determine[d] . . . the basis of the need" for the plant. Id. at 708, quoting Ark. Code Ann. § 23-18-519(b)(1). The state court also found "particularly disturbing" SWEPCO's failure to address the comparative merits and detriments of alternative locations for its plant. Id. at 709.

After SWEPCO submitted a revised analysis in October 2009, the Corps issued a final § 404 permit in December, along with a supporting "Permit Evaluation and Decision" Document (Permit Decision). In pertinent part the Corps' Permit Decision found that the SWEPCO proposal represented the "least environmentally damaging practicable alternative." It also assessed the direct, indirect, and cumulative impacts

of the authorized discharges on environmental resources. The Corps also made a "finding of no significant impact" (FONSI), indicating that the § 404 permit would not have a significant impact on the quality of the human environment.

The final § 404 permit allowed SWEPCO to discharge "dredged and/or fill material" into 8.07 acres of wetlands (5.6 acres prospectively as well as the 2.47 acres filled without authorization) and into or along 8,150 linear feet of streams. The permit also authorized the placement of several transmission lines across the Little and Red Rivers and the disturbance of 0.06 acres of streambed within the Little River in connection with the placement of a cooling water intake structure. The permit required SWEPCO to provide compensatory mitigation for the authorized impacts by enhancing and protecting stream channels on site. SWEPCO purchased mitigation credits from approved mitigation banks.

Despite dissatisfaction with SWEPCO's actions, the plaintiffs did not immediately resort to federal litigation. Instead, they relied on a statement by SWEPCO's president and chief operating officer, Venita McCellon-Allen, that SWEPCO would not construct the plant without first obtaining a valid state Certificate. When construction of the plant continued after the Arkansas courts had invalidated the Certificate, the plaintiffs filed these actions.[2]

In February 2010 the Sierra Club, the National Audubon Society, Audubon Arkansas, and Charles Mills (collectively the Sierra Club) sought to set aside the § 404 permit and to halt construction of the entire plant. The Hunting Club followed suit. They alleged that process that SWEPCO used in obtaining the § 404 permit violated NEPA, the CWA, the ESA, and Arkansas law. The plaintiffs sought

---

[2] On June 24, 2010, SWEPCO filed a notice with the APSC that construction of the Turk Plant would continue under an exemption. See Ark. Code Ann. § 23-18-504(a)(5) (exempting issuance of a Certificate when "the costs of the facility will not be recovered in rates subject to regulation" by the APSC).

declaratory and injunctive relief. In response, SWEPCO contended that the plaintiffs lacked standing and had failed to satisfy the requirements for injunctive relief in Winter v. Natural Resources Defense Council, 129 S. Ct. 365 (2008).

After six days of hearings, the district court granted part of the injunctive relief requested by the plaintiffs in a detailed twenty page order. It found that the individual plaintiffs had standing because they resided "in close proximity to the Turk Plant site" and engaged "in bird watching and many other outdoor activities" around the area. The Sierra Club and the Audubon Societies "both ha[d] an interest in the Turk Plant because of the unique environment around the plant site," and the Hunting Club had standing because it "own[ed] about 4,300 acres located 0.72 miles west of the Turk Plant site."

The court discussed the record at length and considered each of the legal requirements before ruling on the motions for preliminary injunctive relief. It found that the plaintiffs had shown likely "irreparable harm to the environment if a preliminary injunction is not entered" because of the Corps' and the FWS's failure to consider "important environmental factors," such as how power lines would lead to increased raptor predation of the endangered interior least tern. The district court also found that the plaintiffs had, "at the very least," shown a "fair ground for litigation" on the issue of whether the Corps had been arbitrary or capricious in issuing the § 404 permit. The plaintiffs had submitted "ample evidence" that SWEPCO and the Corps had not complied with applicable environmental statutes. The court also found that the balance of harms and the public interest favored the plaintiffs. The court declined to stop construction of the whole plant as the plaintiffs had requested, but enjoined certain activities taken under the § 404 permit.

Neither the Corps nor the FWS has appealed the district court's order granting a small part of the requested injunctive relief, even though they opposed the plaintiffs' motions for preliminary injunctions while they were pending in the district court. On

its appeal, SWEPCO challenges the plaintiffs' standing and argues that the district court abused its discretion in granting the preliminary injunction. During a short period in which we temporarily stayed the injunction, SWEPCO completed some but not all of the actions authorized under the § 404 permit.[3] The appeals in both cases were consolidated for oral argument.

## II.

SWEPCO argues that we should vacate the preliminary injunction for lack of jurisdiction because the plaintiffs lacked standing to bring their federal suits. Its jurisdictional challenges must be considered at the outset. Sierra Club v. Kimbell, 623 F.3d 549, 556 (8th Cir. 2010).

Article III establishes three elements as a constitutional minimum for a party to have standing: (1) "an injury in fact," meaning "the actual or imminent invasion of a concrete and particularized legal interest"; (2) a causal connection between the alleged injury and the challenged action of the defendant; and (3) a likelihood that the injury will be redressed by a favorable decision of the court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). Organizations like the Sierra Club, the National Audubon Society, Audubon Arkansas, and the Hunting Club "can assert the standing of their members," Summers v. Earth Island Inst., 129 S. Ct. 1142, 1149 (2009), so long as (1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members. Save Our

---

[3] According to SWEPCO, as of December 20, 2010 when the stay was vacated, the only remaining work to be completed under the Corps permit involved completion of the installation of the water intake structure in the Little River in a 0.06 acre area; installation of up to ten poles for one of the transmission lines, which would involve less than 0.007 acres of wetland impacts; and completion of four aerial transmission line river crossings.

Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1119 (9th Cir. 2005); see Cent. S.D. Coop. Grazing Dist. v. Sec'y of the U.S. Dep't of Agric., 266 F.3d 889, 895 (8th Cir. 2001); Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

The district court held that each plaintiff had standing. The individual plaintiffs suffered an adequate injury in fact because they resided "in close proximity to the Turk Plant site" and engaged "in bird watching and many other outdoor activities" around the area. The Sierra Club, National Audubon Society, and Audubon Arkansas "ha[d] an interest in the Turk Plant because of the unique environment around the plant site," and the Hunting Club had standing because it "own[ed] about 4,300 acres located 0.72 miles west of the Turk Plant site at its closest point."

SWEPCO argues that the district court erred in inferring an injury in fact "solely on the basis of proximity" because plaintiffs who claim injury from environmental damage must use the area "affected by the challenged activity" rather than "in the vicinity" of it. See Lujan, 504 U.S. at 566. SWEPCO contends that each of the plaintiffs must show harm as a result of the particular activities authorized by the § 404 permit, rather than the overall construction of the plant.

The record shows that plaintiffs have alleged injury in fact from SWEPCO's actions taken under the § 404 permit. While only one plaintiff need show standing to support our subject matter jurisdiction, Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9 (1977), each of the plaintiffs in these cases has shown that the dredge and fill activities permitted by the § 404 permit can or will cause immediate, concrete harm to their interests.

## A. The Hunting Club

SWEPCO argues that the Hunting Club lacks standing. It claims that no activity challenged under the § 404 permit has "any impact on the Hunting Club property, or otherwise would cause any injury to any club member." It further argues that no such finding could be made on the basis of the record, because all of the work "occurs at least a mile downgradient from the Hunting Club property," the Hunting Club's property and the plant site are not part of a connected habitat, and the sites are "separated by a Highway 355 and other developed areas."

SWEPCO's argument relies on the incorrect premise that the Hunting Club would not have suffered an injury in fact without showing environmental impacts on its property. This ignores the significant harms protected under NEPA. For example, the Club has alleged that the Corps violated NEPA in issuing the § 404 permit without adequately considering other alternatives. See, e.g., Hunting Club Complaint at ¶¶ 98–102, 242–64. "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989). Then Judge Stephen Breyer explained in Marsh that NEPA was designed to prevent the "real environmental harm" that could occur through "inadequate foresight and deliberation," especially in light of the "difficulty of stopping a bureaucratic steam roller, once started." Id. at 504.

The Hunting Club has adduced evidence of the very concern foreseen in Marsh. Its member Pat Schultz testified that "since the very beginning," SWEPCO had "just move[d] ahead and then adddress[ed] problems as they arise," all the while arguing that "momentum and their commitment to the project means they don't have to stop." Schultz's testimony is supported by the Corps' April 2008 letter warning SWEPCO that to proceed without a § 404 permit would "be at your own risk." By alleging a NEPA harm and by supporting those allegations with record evidence, the Hunting

Club has shown an injury in fact, even if the work authorized by the § 404 permit occurs a mile from its property or is separated by a state highway. See also Save Our Sonoran, 408 F.3d at 1120 ("Given the members' adjacent land ownership, the development's alleged impact on wildlife in the area, and the alleged diminution of the members' recreational access and use," the plaintiffs had shown standing).

The Supreme Court has also indicated that when plaintiffs seek to enforce procedural requirements "the disregard of which could impair a separate concrete interests of theirs," they can assert that right "without meeting all the normal standards for redressability and immediacy." Lujan, 504 U.S. at 572 & n.7; see also Arthur Hellman, Lauren Robel, & David Stras, Federal Courts: Cases and Materials on Judicial Federalism and the Lawyering Process 131 (2d ed. 2009). The Lujan court explained that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement [EIS], even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." Id. That is precisely what happened here. The Hunting Club, whose property lies adjacent to the plant site and some of whose members reside on it, challenged among other things the Corps' failure to prepare an EIS. See Hunting Club Complaint at ¶¶ 200–01. The Hunting Club alleged an adequate injury in fact under the Lujan standard.

SWEPCO sweeps too broadly by claiming that its § 404 permit activities did not "cause any injury to any club member." Hunting Club member and local area landowner Pat Schultz, for example, testified that he enjoys hunting, fishing, recreating, and exploring on Grassy Lake and other parts of Hunting Club property. He also owns 1,300 acres of land, some of which borders the plant site. Schultz testified that light and noise pollution threatened his aesthetic enjoyment of the area and that the "power line system that is currently being cleared" could "change the habits of the wildlife in the area substantially." Schultz further stated that the

-11-

Ouachita pocketbook mussel, an endangered species, was "actually on my property" and that it was "very important" to him that all endangered species be protected.[4]

Other Hunting Club members offered similar testimony. Yancey Reynolds, who resides on Club property, testified that he enjoys taking pictures, hunting and studying the history and archaeology of the area. Reynolds was disturbed by the "enormous amount of mud" and siltation from the plant site, the "increase in dust" caused by traffic on the highway, as well as by noise and light pollution coming from the plant. He stated: "It just changes the whole area of being in an isolated area when you see a smokestack that you know is going to be belching coal smoke." Mary O'Boyle enjoyed studying the "unique virgin timber" of the cypress swamp in Grassy Lake, and characterized it as "so unchanged" that it was "like the swamp that Yoda lived in in Star Wars." O'Boyle expressed concern about the "dangers" of constructing the power lines and their potential to "wipe out or destroy an endangered species" like the interior least tern. The plaintiffs also presented expert testimony that power lines, such as those authorized by the § 404 permit, present a hazard to least terns because raptors perch on power line poles to prey on the terns.

The record contains evidence that the § 404 permit activities pose an imminent, concrete harm to the Hunting Club and its members. The § 404 permit authorizes the discharge of dredge or fill material into wetlands to facilitate construction of power line crossings that Schultz testified could change the wildlife in the area substantially and that O'Boyle testified could eliminate the nesting sites of the endangered interior least tern. The § 404 permit also authorizes obstruction of the Little River to work on the water intake structure, completion of which would threaten the Ouachita pocketbook mussel which is located on Schultz's property and is very important to

_____

[4] Throughout this litigation SWEPCO has disputed whether any live specimens of the mussel have been found near the water intake structure. The plaintiffs offered expert testimony that placement of the water intake structure in an area where live specimens had been found "has contribut[ed] to impact[ing]" the mussel.

him. Injury in fact necessary for standing "need not be large[;] an identifiable trifle will suffice." Franklin Cnty. Power of Ill., 546 F.3d at 925–26, and cases cited.

We conclude that the district court did not err in concluding that the Hunting Club had "the requisite individual members' standing and organizational purpose" and that nothing "require[d] the participation of individual members." See Sierra Club v. Morton, 405 U.S. 727, 734–35 (1972) ("We do not question that [aesthetic and ecological] harm may amount to an 'injury in fact' sufficient to lay the basis for standing."); Summers, 129 S. Ct. at 1149. The causation and redressability elements of the Club's standing are not disputed, and we see no reason to conclude that they are not satisfied in this case. Kimbell, 623 F.3d at 558. The district court therefore had subject matter jurisdiction over the Hunting Club's claims.

## B. The Sierra Club

SWEPCO also argues that the Sierra Club plaintiffs (both the individuals and the associations) failed adequately to allege injury in fact. Its arguments mirror those it made about the Hunting Club. It claims no plaintiff has demonstrated that the § 404 permit, rather than construction of the plant in general, has caused any actual injury. SWEPCO also states that all "but 0.15 acres of the authorized wetland and stream impacts will occur within the 3,000 acre Turk Plant site, which is private property and not open to public use." It claims the Sierra Club plaintiffs have "presented no evidence that any of the authorized impacts would adversely affect their recreational pursuits" and that they therefore lack standing.

In response the Sierra Club plaintiffs invoke the Supreme Court's decision in Friends of the Earth, Inc. v. Laidlaw Environmental. Services (TOC), Inc., 528 U.S. 167, 181–83 (2000). In Laidlaw, plaintiffs living up to twenty miles from a potentially contaminated river alleged adequate injury in fact by averring that they used the affected area and that their aesthetic and recreational enjoyment of the area

-13-

were lessened by the challenged activity. Id. at 181–83. As the plaintiffs in Laidlaw, the Sierra Club contends that the "affected area" is the plant site as well as the area in its immediate proximity, including a "pristine cypress swamp known as Grassy Lake, the Little River and its bottomlands, and a state wildlife refuge."

We agree that the Sierra Club plaintiffs have alleged adequate injury in fact. Reynolds's testimony suffices to show an injury in fact because he lives in the area and enjoys taking pictures, hunting, and studying its history and archaeology and is disturbed by the "enormous amount of mud" and siltation from the plant site, the "increase in dust" caused by traffic on the highway, as well as noise and light pollution coming from the plant. The district court implicitly found that some of these injuries were caused by actions taken by SWEPCO under its § 404 permit. As a member of the Sierra Club, Reynolds has alleged injuries sufficient both for him as an individual plaintiff and for the Sierra Club as an association.

National Audubon Society member Charles Mills also alleged adequate injury in fact. Mills is an avid bird watcher and nature photographer in the Grassy Lake area. He expressed his concern that plant construction would affect one of the most beautiful areas he has visited. The record suggests that dredging or filling portions of the Little River, installing the water intake structure, and erecting electrical transmission lines would injure those interests. Just as for Reynolds, the threat of harm to Mills's aesthetic interests constitutes an adequate injury in fact. See Laidlaw, 528 U.S. at 183; Morton, 405 U.S. at 734–35. The district court did not err in concluding that the Sierra Club plaintiffs had standing.

III.

SWEPCO argues on the merits that the district court abused its discretion in granting the plaintiffs' motion for a preliminary injunction. We "review the district court's factual findings for clear error, its legal conclusions de novo, and the court's

-14-

equitable judgment—the ultimate decision to grant the injunction—for an abuse of discretion." Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 689–90 (8th Cir. 2003). SWEPCO asserts that the district court "erred with respect to each" of the four requirements for preliminary injunctive relief cited by the Supreme Court in Winter v. Natural Resources Defense Council, 129 S. Ct. 365 (2008). It argues that legal error on any one factor "by itself constitutes an abuse of discretion." The plaintiffs respond that the district court did not err, but that any error would be harmless because the record amply supports the limited injunctive relief granted.

1. Likelihood of Success on the Merits

According to SWEPCO, the district court did not apply the correct standard on the likelihood of success element as shown by its statement that "at the very least," the plaintiffs had shown a "fair ground for litigation" while all the other factors weighed in their favor. SWEPCO argues that this was contrary to Winter. The plaintiffs state that any error in the district court's language was harmless since its order, issued after six days of testimony and review of a large volume of evidence, shows they established a likelihood of success on the merits.

In response to the parties' arguments we have undertaken an exhaustive review of the record that was before the district court, including related decisions issued by the federal agencies. The Sierra Club alleges that the Corps failed to comply with NEPA's requirement that federal agencies include a detailed statement on "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C); see Davis v. Mineta, 302 F.3d 1104, 1120 (10th Cir. 2002). The record includes a site selection study, commissioned by SWEPCO's parent company, which evaluated twelve possible sites for the plant. That study scored Hempstead County as the ninth choice, and it was not even the preferred or alternative site in Arkansas. The plant site with the highest weighted score was in Pirkey, Texas. The study favored Pirkey in part because it was "designed to house a future second unit" for pulverized coal and there was "sufficient

-15-

space, infrastructure, fuel, water, and landfill area to accommodate" the needs of a coal fired plant. The Pirkey site also was owned by SWEPCO's parent company, had source for cooling water onsite, was located adjacent to a lignite coal mine, and had a preexisting landfill.

Despite this study, the Permit Decision underlying the § 404 permit favored Hempstead County because it (unlike Pirkey) provided "geographic dispersion of generation for reasons of efficiency, security and reliability"; placing it in Arkansas would "benefit the entire southern Arkansas region"; and that site "ha[d] obtained the necessary regulatory approvals from the APSC." The Sierra Club has pointed out that much of this is simply wrong. SWEPCO has admitted that none of the electricity generated by the plant will go to Arkansas ratepayers. To get the exemption from the Arkansas state Public Service Commission, SWEPCO was required to certify that the "costs of the facility will not be recovered in rates subject to regulation" by it. See Ark. Code Ann. § 23-18-504(a)(5).

At the time the Permit Decision was issued the "necessary regulatory approvals" for the site had not been obtained. In fact, the Arkansas Court of Appeals had already invalidated the Certificate, in part because it found "particularly disturbing" SWEPCO's failure to address the comparative merits and detriments of alternative locations for the plant. See Hempstead Cnty. Hunting Club, Inc. v. Ark. Pub. Serv. Comm'n, 324 S.W.3d 697, 709 (Ark. Ct. App. 2009). The Permit Decision acknowledged that the Pirkey location would fill fewer wetlands than the Hempstead County site and would not require an entire new plant to be constructed. More importantly, the Permit Decision failed to acknowledge that there were "no known endangered or threatened species or rare habitats" near the Pirkey site, unlike the Hempstead County site. We agree with the district court that there was thus "ample evidence" showing that the plaintiffs were likely to succeed on their claims that the Corps failed to include a detailed statement on "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C); see also Davis, 302 F.3d at 1120–21.

-16-

The Sierra Club plaintiffs also argued that the Corps acted arbitrarily and capriciously by failing to prepare an environmental impact statement (EIS).[5] NEPA requires all federal agencies, including the Corps, to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A § 404 permit issued by the Corps is a "Federal action" to which NEPA applies. Save Our Sonoran, 408 F.3d at 1121. If it is unclear whether a federal action will significantly affect the quality of the environment, the agency should prepare an environmental assessment (EA), which is a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement is . . . necessary." Newton Cnty. Wildlife Ass'n v. Rogers, 141 F.3d 803, 809 (8th Cir. 1998); see Davis, 302 F.3d at 1111 & n.3. Each EA "shall include" discussions of the "environmental impacts of the proposed action," see 40 C.F.R. § 1508.9(b), including "cumulative" impacts. Davis, 302 F.3d at 1121.

The Sierra Club plaintiffs alleged that the Permit Decision underlying the § 404 permit failed to analyze the cumulative impacts reasonably foreseeable from the expected addition of a second generation unit at the plant. SWEPCO had previously admitted it had planned to add a second unit at the Hempstead County site, and the Permit Decision failed to analyze the possible cumulative impacts from that second unit. As in Davis, the failure to consider these cumulative possibilities together is "one of the most egregious shortfalls of the EA." 302 F.3d at 1121–22; see also Save Our Sonoran, 408 F.3d at 1121–23 (Corps improperly constrained NEPA analysis). The district court was correct to conclude that the Sierra Club plaintiffs were likely to succeed on the merits of this claim under NEPA. And to the extent that Hunting Club raises similar NEPA claims, it was likely to succeed on the merits as well.

_____

[5] At this point, a "second layer of review comes into play," because actions of the Corps and FWS "are themselves examined under a highly deferential, 'arbitrary and capricious' standard" derived from the Administrative Procedure Act. Davis, 302 F.3d at 1111. We thus ask whether it was an abuse of discretion for the district court to find that the Corps acted arbitrarily or capriciously in failing to issue an EIS.

-17-

The plaintiffs were particularly likely to succeed on their NEPA claims in light of SWEPCO's repeated decisions to proceed with plant construction even in the absence of administrative authority. Despite the April 2008 warning letter from the Corps, SWEPCO proceeded with plant construction without a § 404 permit. After the Arkansas Court of Appeals invalidated its state Certificate, SWEPCO continued with plant construction, despite chief operating officer McCellon-Allen's previous statement that it would not proceed without one. SWEPCO even filled in 2.47 acres of wetlands without authorization by March 2009, which it explains was a result of careless "errors in mapping and flagging of wetland boundaries." Similar actions have been termed "bureaucratic steam roll[ing]" elsewhere, and we conclude that the plaintiffs showed a likelihood of succeeding on the merits of their claims under NEPA. See Marsh, 872 F.2d at 504 ("The difficulty of stopping a bureaucratic steam roller, once started, still seems . . . a perfectly proper factor for a district court to take into account.").

Distinct from these NEPA claims, the Hunting Club raised a claim under the ESA that the Corps and the FWS failed to undertake an adequate analysis of endangered species. In its complaint, the Hunting Club alleged that neither the Corps nor the FWS based their decisions regarding species impacts on adequate scientific data, and that they both failed to consider how changing water levels, sediment loadings, water temperatures, and accumulation of heavy metals would affect endangered species in the area. See Hunting Club Complaint at ¶¶ 295–304. If true, these failures would violate provisions in the ESA that require federal agencies to ensure that any action they authorize is not likely to jeopardize a listed species or adversely modify its critical habitat. See 16 U.S.C. § 1536(a)(2); Heartwood, Inc. v. U.S. Forest Serv., 380 F.3d 428, 434 (8th Cir. 2004).

The district court found, and we agree, that there was "ample evidence" to be "dubious about" the Corps' analysis of indirect "environmental impacts" of the § 404 permit. "[E]nvironmental impacts" likely include impacts on endangered species like

-18-

the interior least tern and the Ouachita pocketbook mussel. The Hunting Club presented expert testimony about the presence of live specimens of the mussel in the Little River and the location of a nesting site of interior least terns at the confluence of the Little and Red Rivers. Placement of several transmission lines and the water intake structure—both of which are authorized by the § 404 permit—could jeopardize these species. Yet the Permit Decision underlying it only posited that "bird mortality due to transmission line collisions is a potential source of impact." We agree that the Hunting Club showed a likelihood of success on the merits of this ESA claim.

In the face of the large volume of evidence in the record which the plaintiffs have cited in support of the preliminary injunction, SWEPCO chooses to focus on some of the language used by the district court. It complains that the court only found that the plaintiffs had shown "a fair ground for litigation" instead of a likelihood of success. While analyzing the likelihood of success factor for preliminary injunctive relief, the district court stated in part:

[W]ithout resolving the issues one way or the other, Plaintiffs have at the very least established a fair ground for litigation regarding whether the Corps was arbitrary and capricious in issuing the § 404 permit. They have submitted ample evidence to cause me to be dubious about, among other things, the sufficiency of the alternatives analysis, the project's defined purpose, analysis of the cumulative and indirect environmental impacts, and the scope of authority the Corps claims to have.

SWEPCO points to this portion of the order to argue that the district court did not comply with the Supreme Court's Winter decision.

In Winter, the Supreme Court considered a challenge by the Secretary of the Navy to a preliminary injunction upheld by the Ninth Circuit which had barred the use of active sonar equipment during submarine training exercises for fear of harm

-19-

to marine mammals.  Nat. Res. Def. Council, Inc. v. Winter, 518 F.3d 658, 677 (9th Cir. 2008).  The Supreme Court held that the lower courts had erred by granting preliminary injunctive relief "based only on a possibility of irreparable harm." Winter, 129 S. Ct. 365, 375 (2008) (quotation omitted).  The Supreme Court rejected this "possibility" standard, for a movant seeking injunctive relief must "demonstrate that irreparable injury is likely in the absence of an injunction."  Id. at 375.  The Court also concluded that the government's interest in national defense and in conducting "realistic training exercises . . . to neutralize the threat posed by enemy submarines" clearly outweighed the plaintiffs' ecological, scientific, and recreational interests in marine mammals.  Id. at 382.

Winter focused on the requirement that a party seeking preliminary injunctive relief show a likelihood of irreparable harm before it examined the competing interests of the parties and the public.  It held that the Ninth Circuit had "significantly understated the burden" of the injunction on the Navy and that any harm to the plaintiffs would have been "outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors."  Id. at 377, 376.  For these reasons the Court did not need to consider whether the plaintiffs had established a likelihood of success on the merits.  Id. at 376.  Although likelihood of success did not need to be addressed in Winter, the Court recognized that factor as one of the four factors which are relevant to obtain preliminary injunctive relief.  It also noted that the standard for preliminary injunctive relief requires a showing of a "likelihood of success on the merits rather than actual success" as necessary for permanent relief.  Id. at 381, quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987).

In this case the district court used wording once familiar[6] to it in issuing its injunctive relief.  It found that "at the very least" the plaintiffs had "established a fair

_____

[6] See Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 112 (8th Cir. 1981) (en banc).

ground for litigation" regarding whether the Corps was arbitrary and capricious in issuing a § 404 permit because they had submitted "ample evidence" on their environmental claims. Elsewhere the court explained that the plaintiffs had raised "serious issues with the analysis and conclusions of the Corps in issuing the FONSI" and had pointed out "several potential harms apparently not considered by the Corps." The district court cited hundreds of pages of documents in the administrative record in support of its findings and conclusions.

After carefully examining the district court's lengthy order and the record made in this case we conclude that the requirement that plaintiffs show they were likely to succeed on the merits was more than satisfied. To be sure, the district court did not use the preferred wording, but it was clearly familiar with the Supreme Court's Winter decision, citing it when deciding whether there was irreparable harm. Dist. Ct. Order at 8, citing Winter, 129 S. Ct. at 375. It surely was also aware of the Court's language on the previous page that a plaintiff must also show it was likely to succeed on the merits. See id. at 374. The parties discussed Winter extensively, and there is no reason to believe the court overlooked any part of its standard.[7]

The district court found that all of the necessary elements for preliminary relief were satisfied after hearing six days of evidence and citing to specific portions of the administrative record. Based on the wealth of evidence it was considering and on which its findings were based, it found that the plaintiffs had raised "serious issues"

---

[7] Since the Winter Court did not discuss the likelihood of success element, it expressed no opinion about various approaches in the circuit courts. See Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–35 (9th Cir. 2011); Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35–38 (2d Cir. 2010); Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009); Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 346 (4th Cir. 2009), vacated and remanded on other grounds, 130 S. Ct. 2371 (2010), opinion reissued, 607 F.3d 355, 355 (4th Cir. 2010) (per curiam).

and shown "several potential harms" not considered by the Corps. We conclude that the district court adequately considered and found that the plaintiffs were likely to succeed on the merits despite its occasional imprecise use of language.

Having concluded that there is ample evidence in the record to show the plaintiffs were likely to succeed on at least three of their claims, we need not address the many others.[8] We conclude that the plaintiffs have shown a likelihood of success. Any error by the district court in the wording of its order is harmless in light of this extensive record and considering the court's statements in their full context. See 28 U.S.C. § 2111; Compare Winter, 129 S. Ct. at 376 (suggesting that any harmless error should be affirmed).

### 2. Likelihood of Suffering Irreparable Harm

SWEPCO next argues that none of the plaintiffs demonstrated that they would suffer a likely threat of irreparable harm *to themselves* if the activities authorized by the § 404 permit are completed. It specifically takes issue with the district court's finding that continued work would risk harm "to the environment," rather than to the plaintiffs' interests. Reprising its standing argument, SWEPCO complains that the injunction order fails to show any connection between the enjoined activities and the plaintiffs' identified interests, particularly in light of the fact that "more than 98 percent of the impacts authorized by the Corps permit already had occurred" at the time of the injunction. SWEPCO also suggests that aside from the lack of analysis in the district court's order, the record does not support a finding of irreparable harm.

---

[8] Some of the other claims include the Hunting Club's allegations that SWEPCO and the Corps violated Arkansas law. The district court certified these questions to the Arkansas Supreme Court and did not discuss them in its order.

SWEPCO raises one issue specific to the Hunting Club's claims. According to SWEPCO, any concern that completing the § 404 permitted activities would endanger the Ouachita pocketbook mussel is legally flawed and unsupported in the record because no live mussels had been found "anywhere near the location of the Turk Plant intake structure." Since the 0.06 acre area where the intake structure is to be located is not part of the mussel's designated "critical habitat," SWEPCO asserts that the § 404 permit activities would not jeopardize the mussel's existence.

The plaintiffs interpret "harm to the environment" as "harm to the plaintiffs' specific environmental concerns." The plaintiffs' interests include "hunting, fishing, birdwatching, [and] nature-indulging," and they read "injury to the environment" as "synonymous with injury to the plaintiff who uses it." So construed, they suggest that the district court's order shows a likelihood of irreparable harm. After fighting with SWEPCO for more than five years, the Hunting Club concludes that "no one can seriously dispute that the interests [its members] have are indistinguishable from the environment." With respect to the Ouachita pocketbook mussel, the Hunting Club further cites its expert's testimony that installation of the water intake pipe in the Little River would threaten mussel and mussel larvae populations. The Hunting Club argues that competing expert testimony on this issue of fact is not enough to overturn the district court's factual finding or to conclude that it abused its discretion.

Citing Winter, the district court held that the plaintiffs were likely to suffer irreparable harm. See 129 S. Ct. at 374–75. It explained that their harm flowed from a violation of NEPA itself, in that failure to comply with NEPA requirements caused a risk that "real environmental harm will occur through inadequate foresight and deliberation." See Marsh, 872 F.2d at 504. It further noted that the plaintiffs raised "serious issues" with respect to the Corps' issuance of a FONSI and its failure to prepare an EIS. With respect to the Hunting Club's ESA claims, the district court was particularly troubled that the Corps had failed to consider important environmental factors in issuing the § 404 permit, such as how permit activities could lead to

-23-

increased raptor predation of the endangered interior least terns. It found that absent an injunction the Hunting Club would suffer harms from "[m]ore filling of wetlands, placement of the intake structure, and spanning transmission lines."

The district court did not clearly err in its factual findings or err with respect to its legal conclusions. It may have used imprecise language in finding a likelihood of irreparable harm "to the environment" rather than to the plaintiffs' study and enjoyment of it, but in this case irreparable harm to the environment necessarily means harm to the plaintiffs' specific aesthetic, educational and ecological interests. The record discloses both procedural and concrete, substantive environmental harms.

We agree with the district court's conclusion that the failure to comply with NEPA's requirements causes harm itself, specifically the risk that "real environmental harm will occur through inadequate foresight and deliberation." Marsh, 872 F.2d at 504; see Sierra Club v. U.S. Army Corps of Eng'rs, 446 F.3d 808, 816 (8th Cir. 2006) (injury under NEPA includes "failing to issue a required environmental impact statement"); Davis, 302 F.3d at 1114. As explained above, the plaintiffs have produced evidence showing that the Corps likely failed to give adequate consideration to alternatives to the construction of the plant and that SWEPCO "steam rolled" through the permitting process despite initially failing to secure a § 404 permit. While not the only factor the district court considered, the "difficulty of stopping a bureaucratic steam roller, once started" was a proper factor for the district court to take into account. See Marsh, 872 F.3d at 504.

We also find Davis instructive. There, the Tenth Circuit held that a district court abused its discretion in failing to enjoin construction of a highway that would have bisected a public park. The court held that harm to the environment "may be presumed when an agency fails to comply with the required NEPA procedure." 302 F.3d at 1115. While the plaintiffs were still required to show irreparable harm to themselves under NEPA, they could do so by showing "injury to their specific

-24-

environmental interests." Id. Just as in Davis, the Hunting Club's property "will be directly impacted by [the plant,] and [its] size and scope . . . supports a conclusion that the injury is significant." Id.

Equally important, the record shows that any injury to the environment in these cases will necessarily harm the plaintiffs' environmental interests. Schultz's aesthetic enjoyment of the Grassy Lake area was harmed by light and noise pollution caused by plant construction. Schultz testified that he was concerned about the "power line system that is currently being cleared" in particular. Reynolds was likely harmed by the "enormous amount of mud" and siltation from the plant site, the "increase in dust" caused by traffic on the highway, as well as noise and light pollution coming from the plant. And O'Boyle was likely to be harmed by the potential for power lines to "wipe out or destroy an endangered species" like the interior least tern. Interference with the plaintiffs' interests in studying and enjoying the environment are cognizable harms protected by important environmental statutes. See, e.g., Friends of the Earth, 528 U.S. at 183; Lujan, 504 U.S. at 562; Morton, 405 U.S. at 734–35.

SWEPCO mistakenly suggests that the Hunting Club has shown no harm to its interest in preserving the Ouachita pocketbook mussel. Its member Schultz has a "very important" interest in protecting all endangered species, including the mussel, and mussel specimens have been found on his property. While SWEPCO's expert did not find live mussels near the water intake structure, the Hunting Club's expert opined that there was a "viable population of [mussels] within the stretch of the Little River between Millwood Dam [and] the Red River." The district court credited this testimony, and it did not commit clear error in doing so.

3. Balance of Harms

With respect to the balance of harms, SWEPCO argues that the huge financial cost of enjoining the § 404 permit activities amounts to an abuse of discretion.

-25-

According to SWEPCO, the injunction costs $8,000 per day for idled equipment, $400,000 in equipment demobilization, and $250,000 for demobilizing the contractor for the water intake structure. In a worst case scenario, the injunction could cost $11 million per month depending on the extent of the delay in the plant's completion date. The balance of harms according to SWEPCO is "between millions of dollars in potential losses to SWEPCO from construction delays, on one hand, and the harm to Plaintiffs if the limited remaining work from the Corps permit is not enjoined."

In response the plaintiffs cite one huge equity in their favor. SWEPCO commenced plant construction a year before the § 404 permit was issued, repeatedly ignoring administrative and legal challenges and a warning by the Corps that construction would proceed at its own risk. Any harm, they argue, was self inflicted.

The district court held that the balance of harms favored the plaintiffs because absent an injunction there would be environmental injury which, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration." Given the limited nature of the injunctive relief granted, the court properly considered only the cost to SWEPCO of enjoining work on the § 404 permit rather than SWEPCO's estimate based on an injunction of the entire project. Also important in the district court's calculus was SWEPCO's decision to begin work at the plant before obtaining a § 404 permit. The court stated, "It is clear that SWEPCO's decision to proceed with building the Turk Plant without the § 404 permit is a major reason the [preliminary injunction motion] is being decided at this relatively late stage in the building process." Balancing "monetary costs against loss to the environment," the court held that "environmental harm outweigh[ed] monetary harm."[9]

---

[9] SWEPCO again asserts that the district court erred in balancing the "environmental harm" against its harm, instead of harm to the plaintiffs' interests. This criticism is without merit. The record demonstrates that harm to the environment in this case is coextensive with the plaintiffs' environmental interests.

We agree. The district court found that the plaintiffs would suffer harm to their enjoyment of the environment, which "can seldom be adequately remedied by money damages and is often permanent or at least of long duration." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). This finding of fact is not clearly erroneous. Nor did the district court err in calculating SWEPCO's harm by reference to the cost of enjoining the specific § 404 permit activities rather than the entire plant in general. In so doing, it simply adhered to SWEPCO's litigation strategy of analyzing the costs and benefits of an injunction through the lens of the § 404 permit. SWEPCO cannot now have it both ways.

The district court's analysis of the balance of harms was not an abuse of discretion particularly because any injury to SWEPCO was largely self inflicted. SWEPCO spent about $800 million on plant construction before the § 404 permit was issued and ignored the Corps' April 2008 warning letter that construction would proceed "at [its] own risk." When agencies "jump the gun" or "anticipate[] a pro forma result" in permitting applications, they become "largely responsible for their own harm." Davis, 302 F.3d at 1116.

This case is far different from Winter, which has been frequently cited by SWEPCO. There, the Supreme Court reversed the grant of a preliminary injunction in part because the court had improperly weighed the Navy's interest in effective, realistic training of its sailors. See 129 S. Ct. at 376–78. That case implicated the federal government's interest in "prepar[ing] for war" through "integrated training exercises at sea," id. at 370, and the Navy was appealing the grant of an injunction adverse to it. Here, by contrast, the federal agencies involved have not appealed. Only SWEPCO, as defendant-intervenor, has challenged the district court's grant of injunctive relief. The district court did not abuse its discretion in concluding that the balance of harms in this case weighed in favor of an injunction.

4. The Public Interest

Finally, SWEPCO argues that the district court abused its discretion by failing to give proper consideration to the public interest. It complains that the injunction put at risk "over 100 permanent jobs" and delayed opening a reliable supply of electricity in disregard of the findings of need for such electricity by regulatory commissions in three states. According to SWEPCO, there is no basis in the record for a finding that an injunction of activities discussed in the § 404 permit was in the public interest.

In response, the plaintiffs argue that potential job losses, cost overruns and losses of electricity simply do not justify a finding that the injunction was not in the public interest. Instead, the fact that electricity from the plant would not go to Arkansas citizens, while pollution from the plant *would* harm them, confirmed the district court's reasoning.

The district court found that an injunction was in the public interest because it would convey to the public the importance of having its government agencies fulfill "their obligations and comply[] with the laws that bind them." The district court rejected SWEPCO's arguments that an injunction would put at risk hundreds of jobs and threaten the electric generating capacity of a region in need. "[O]utside of SWEPCO's bare assertions," it noted, there was "no other evidence of need . . . anywhere in the record."

The district court's analysis on this element is sound. We agree that, just as important as the public interest in potential economic gains is "the public's confidence that its government agencies act independently, thoroughly, and transparently when reviewing permit applications." The "environmental dangers at stake in this case are serious," see Davis, 302 F.3d at 1116, and the public interests that might be injured by a preliminary injunction, such as temporary loss of jobs or delays in increasing

-28-

energy output in the region, "do not outweigh the public interests that will be served." Alliance for the Wild Rockies, 632 F.3d at 1138.

## IV.

For the reasons already discussed, the preliminary injunction is affirmed and the case is remanded to the district court.[10]

SHEPHERD, Circuit Judge, concurring in the judgment.

I would anchor our resolution of this appeal on the applicable appellate standard of review. Thus, I would affirm simply because the district court's findings of fact are not clearly erroneous, it committed no legal error, and it did not abuse its discretion in granting a preliminary injunction. Heartland Acad. Cmty. Church, 335 F.3d at 689–90.

---

[10] The parties stated at oral argument that cross motions for summary judgment were fully briefed and ready for decision by the district court assigned to the case. (The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation.)